Argued and submitted December 28, 1998, affirmed March 8, petition for review denied May 31, 2000 (330 Or 361)

## In the Matter of the Compensation of
## Melvin C. Woda, Claimant.

### WEYERHAEUSER COMPANY,
*Petitioner,*

*v.*

### Melvin C. WODA,
*Respondent.*

### (96-11475; CA A101658)

998 P2d 226

John M. Pitcher argued the cause and filed the brief for petitioner.

Christopher D. Moore argued the cause for respondent. With him on the brief was Malagon, Moore & Jensen.

Before Landau, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

LANDAU, P. J.

Deits, C. J., dissenting.

## LANDAU, P. J.

At issue in this case is whether claimant's respiratory condition—a sudden allergic reaction to wood dust at work—must be analyzed as a claim for an occupational disease or as an occupational injury. Different burdens of proof pertain to occupational diseases and occupational injuries, so the distinction is significant. The Workers' Compensation Board (Board) concluded that the condition was properly analyzed as an occupational injury, because it consisted of an event that occurred suddenly in reaction to exposure to the dust. Employer seeks review of the Board's decision, arguing that, under the applicable statutes, claims arising out of exposure to dust are to be treated as occupational diseases, whether sudden in onset or not. We conclude that the Board was correct and affirm.

The relevant facts are not in dispute. Claimant began working for employer as a kiln operator in February 1996. He had worked in the same position for other employers for the previous 30 years. He suffered from long-standing seasonal allergies, with symptoms of sneezing, nasal congestion, itching of the eyes, and occasional breathing difficulties when exposed to grass. In September 1996, claimant was transferred from his position as a kiln operator to a position in a sawmill. The sawmill work exposed claimant to a significant quantity of wood dust. Immediately after starting work at the sawmill, claimant developed shortness of breath, coughing, and wheezing. The symptoms resolved within two to three hours of leaving the mill. During the first three days of work at the mill, the pattern was the same. Claimant's first weekend off, the symptoms completely disappeared, but when he returned to work the following Monday, he immediately experienced worsened shortness of breath, which prompted him to seek emergency hospital care.

Claimant was diagnosed with "acute bronchospasm," "allergic rhinitis," and allergic asthma. Claimant filed a claim based on the allergic reaction to the wood dust at the sawmill. Employer denied the claim. At the hearing on the claim, employer argued that the claim must be analyzed as an occupational disease claim based on the worsening of a preexisting disease or condition, under ORS 656.802(2)(b),

which requires that claimant establish that his work activity was the major contributing cause of the combined condition and the pathological worsening of the disease. Claimant argued that the claim must be analyzed as one for an occupational injury under ORS 656.005(7)(a)(B), which requires only that he establish that his work activity was the major contributing cause of his disability or need for treatment of the combined condition. The administrative law judge agreed with claimant and further concluded that claimant satisfied his burden under ORS 656.005(7)(a)(B).

Employer appealed to the Board, and a divided Board affirmed. The majority concluded that, in accordance with a long line of appellate court decisions, the difference between an occupational disease and an occupational injury turns on the extent to which the symptoms of a condition are gradual in onset and not attributable to a specific activity or event. In this case, the Board held, the evidence shows that claimant's condition was an immediate reaction to exposure to wood dust at the sawmill and was not gradual in onset. The Board concluded that the claim had been analyzed properly as one for an occupational injury. Two Board members dissented, arguing that ORS 656.802(1)(a) expressly defines "occupational disease" to include any disease caused by contact with dust.

On review, employer takes up the banner of the dissenting Board members. It argues that the Board's decision is directly contrary to the "plain meaning" of the definition of occupational disease in ORS 656.802(1)(a), which, it contends, shows that the legislature intended that all claims resulting from toxic exposures be treated as "diseases or infection." Claimant argues that the Board was correct and that employer's argument neglects to address the fact that the reference in ORS 656.802(1)(a) to diseases caused by exposure to dust necessarily incorporates the definition of "disease" that has been used by the courts consistently for many years and never altered by the legislature, namely, that a disease is a condition the symptoms of which develop over a period of time and are not sudden in onset.

■ We acknowledge at the outset that the issue is a difficult one and that we are benefitted by the careful consideration that all members of the Board and the parties have

devoted to it. Having said that, we conclude that the Board majority and claimant have the better of the argument.

■ Our analysis begins with the text of the relevant statute in its context. *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). That analysis includes consideration of the Supreme Court's prior construction of the statute, which, the court instructs us, becomes part of the statute itself. *Stephens v. Bohlman*, 314 Or 344, 350 n 6, 838 P2d 600 (1992). It also includes consideration of prior versions of the statute. *Krieger v. Just*, 319 Or 328, 336, 876 P2d 754 (1994).

What is now ORS 656.802(1) dates back to 1959, when an occupational disease was defined as

> "[a]ny disease or infection which arises out of and in the scope of employment, and to which an employee is not ordinarily subjected or exposed other than during a period of regular actual employment therein."

ORS 656.802(1) (1959). That version of the statute did not define the term "disease," much less identify the distinction between a "disease" and an "injury" as those terms are used in the workers' compensation statutes. We first addressed that question in *O'Neal v. Sisters of Providence*, 22 Or App 9, 537 P2d 580 (1975). In that case, we adopted the distinction articulated in Professor Larson's treatise on workers' compensation law:

> " 'What set[s] occupational diseases apart from accidental injuries [is] both the fact that they can[not] honestly be said to be unexpected, since they [are] recognized as an inherent hazard of continued exposure to conditions of the particular employment, and the fact that they [are] gradual rather than sudden in onset.' "

*Id*. at 16 (quoting 1B Larson's, *Workmen's Compensation Law* § 41.31 (1973)).

In *James v. SAIF*, 290 Or 343, 614 P2d 565 (1981), the Supreme Court first addressed the question. After describing our holding in *O'Neal*—specifically our reliance on the gradual versus sudden onset distinction derived from the Larson treatise—the court declared that we were correct. *Id*. As we have noted, we must treat that construction of ORS

656.802(1) as having become part of the statute. *Stephens*, 314 Or at 350 n 6.

In 1987, the legislature amended ORS 656.802, in effect, to create three categories of occupational diseases:

"(1) As used in this chapter, 'occupational disease' means:

"(a) Any disease or infection arising out of and in the course of employment caused by ingestion of, absorption of, inhalation of or contact with dust, fumes, vapors, gasses, radiation or other conditions or substances to which an employee is not ordinarily subjected or exposed other than during a period of regular actual employment therein, and which requires medical services or results in disability or death.

"(b) Any mental disorder arising out of and in the course of employment and which requires medical services or results in physical or mental disability or death.

"(c) Any series of traumatic events or occurrences arising out of and in the course of employment which requires medical services or results in physical disability or death."

ORS 656.802(1) (1987). The statute still contained no definition of the term "disease." And nothing in the language of the amended statute or its legislative history suggests that the legislature intended to alter the judicially created definition adopted in *O'Neal* and *James*. *See Goodyear Tire & Rubber Co. v. Tualatin Tire & Auto*, 322 Or 406, 416, 908 P2d 300 (1995) (examining legislative history of related statutes as part of statutory context).

In 1990, the legislature again amended ORS 656.802(1). This time, the legislature enacted a general definition of the term "occupational disease," followed by the three categories that originated with the 1987 amendments:

"(1) As used in this chapter, 'occupational disease' means any disease or infection arising out of and in the course of employment caused by substances or activities to which an employee is not ordinarily subjected or exposed other than during a period of regular actual employment therein, and which requires medical services or results in disability or death, including:

"(a) Any disease or infection caused by ingestion of, absorption of, inhalation of or contact with dust, fumes, vapors, gases, radiation or other substances.

"(b) Any mental disorder which requires medical services or results in physical or mental disability or death.

"(c) Any series of traumatic events or occurrences which requires medical services or results in physical disability or death."

ORS 656.802(1) (1991). Once again, however, the legislature did not define the term "disease." And, once again, nothing in the language of the amended statute or its enactment history suggests that the legislature intended to abandon the definition of the term adopted in *O'Neal* and *James*. To the contrary, the Supreme Court held that the definition of the term—more precisely, the distinction between a disease and an injury based on the suddenness of symptom onset—survived the enactment of the 1987 and 1990 amendments.

In *Mathel v. Josephine County*, 319 Or 235, 875 P2d 455 (1994), the court addressed the question whether the claimant's stress-induced heart attack must be analyzed as an occupational disease or an occupational injury. The court began by noting that the legislature did not define either the term "injury" or the term "disease." The court referred to ordinary dictionary definitions of the terms that describe an injury as a discrete event and a disease as an ongoing condition or state of the body or mind. *Id.* at 240 (citing *Webster's Third New Int'l Dictionary*, 648, 1164 (unabridged ed 1993)). The court then remarked that those definitions suggest that a heart attack is an injury, because it is a discrete event, rather than an ongoing condition.

The court then turned to its decision in *James*:

"That conclusion [that a heart attack is an injury] is consistent with this court's decision in *James v. SAIF*, 290 Or 343, 614 P2d 565 (1981). In that case, this court considered the difference between 'injury' and 'disease' under the Workers' Compensation Law and adopted the following distinction:

" ' "What set[s] occupational diseases apart from accidental injuries [is] * * * the fact that they [are] gradual

rather than sudden in onset. * * *" ' *Id.* at 348 (quoting 1B Larson's Workmen's Compensation Law § 41.31 as cited in *O'Neal v. Sisters of Providence*, 22 Or App 9, 537 P2d 580 (1975))."

*Mathel*, 319 Or at 240; *see also Fuls v. SAIF*, 321 Or 151, 894 P2d 1163 (1995) ("[T]his court's cases have drawn a distinction between occupational diseases and occupational injuries along the lines that occupational diseases are gradual rather than sudden in onset.").

In 1995, the legislature again amended ORS 656.802(1) so that it now reads:

"(1)(a) As used in this chapter, 'occupational disease' means any disease or infection arising out of and in the course of employment caused by substances or activities to which an employee is not ordinarily subjected or exposed other than during a period of regular actual employment therein, and which requires medical services or results in disability or death, including:

"(A) Any disease or infection caused by ingestion of, absorption of, inhalation of or contact with dust, fumes, vapors, gases, radiation or other substances.

"(B) Any mental disorder, whether sudden or gradual in onset, which requires medical services or results in physical or mental disability or death.

"(C) Any series of traumatic events or occurrences which requires medical services or results in physical disability or death.

"(b) As used in this chapter, 'mental disorder' includes any physical disorder caused or worsened by mental stress."

The principal changes were to add the clause "whether sudden or gradual in onset," to subsection (1)(a)(B) and to specify what is included in the term "mental disorder."

As was true of all previous amendments to the statute, the 1995 amendments do not define the term "disease." And, as was true of all previous amendments, there is nothing in the text or the history of the 1995 enactment that suggests that the legislature intended to abandon the now familiar distinction between a disease and an injury. If anything,

the amendments suggest the opposite. By adding the clause "whether sudden or gradual in onset" to subsection (1)(a)(B), the legislature expressly invoked the judicially created distinction adopted in *O'Neal* and reaffirmed in *James*, *Mathel*, and *Fuls*. The legislature expressly excepted mental disorders from the general rule that a disease within the meaning of the occupational disease statute refers to conditions the symptoms of which are gradual in onset.

■■ In light of the foregoing history, several things seem clear. First, the legislature never has defined the term "disease" as the term is used in ORS 656.802(1). Second, in the absence of a legislative definition, the courts have created one and have used it consistently for 25 years. That judicially created definition was adopted by the Supreme Court, and, according to Supreme Court doctrine, it became part of the statute subject to change by legislative amendment only. Third, since the adoption of that definition by the Supreme Court, the legislature has not defined the term differently and has not enacted language that is inconsistent with the judicially created definition. Instead, the subsequent amendments suggest implicit legislative adoption of the judicially created definition. In short, all the relevant interpretive considerations lead us to conclude that the Board was correct in holding that to determine whether a given condition is a disease or an injury requires examination of whether the symptoms of the condition were sudden or gradual in onset.

Employer's and the dissenting Board members' arguments to the contrary cannot be squared with the language of the statute and the manner in which it has been interpreted by the courts. Their principal contention is that ORS 656.802(1)(a)(A) requires this case to be analyzed as an occupational disease, because it commands that "[a]ny disease or infection caused by * * * inhalation of or contact with dust" is an occupational disease. Thus, they argue, *any* disease caused by inhalation of dust applies, whether sudden or gradual in onset. The argument, however, neglects to consider that the word "any" still modifies the term "disease," which has been construed to mean only conditions the symptoms of which are gradual in onset.

For similar reasons, employer's and the dissenting Board members' other arguments are unavailing. They argue, for example, that the reasoning of the Supreme Court in its *Fuls* decision suggests that "[a]ny disease" means any disease however sudden its onset. In *Fuls*, the court addressed whether the claimant's mental disorder must be analyzed as an occupational disease or an occupational injury when it was precipitated suddenly by a single work-related incident. 321 Or at 158. The court held that, although it had adopted a distinction between a disease and an injury on the basis of the suddenness of onset, because the legislature provided in ORS 656.802(1)(b) (1990) that "[a]ny mental disorder" be regarded as an occupational disease, the usual distinction between disease and injury was rendered irrelevant. *Id.* Employer and the dissenting Board members argue that, for the same reason, the statutory reference to "[a]ny disease" caused by inhalation to dust must also be construed to apply without reference to suddenness of onset.

The argument, however, ignores the fact that the reference to "[a]ny disease" in ORS 656.802(1)(a)(A) retains the use of the term "disease," which is a term that has acquired a specific definition that cannot simply be ignored. The term "mental disorder" has not acquired the same definitional patina. Thus, the court's reasoning in *Fuls* is inapplicable.

Chief Judge Deits adopts the reasoning of employer and the dissenting Board members, but she offers additional arguments, which we also find unpersuasive. The linchpin of her dissent is her assertion that we conflate the terms "disease" and "occupational disease." According to Judge Deits, the existing case law defines only the term "occupational disease," and that term has since been superseded by the more recent amendments to the statute. Therefore, she concludes, the prior case law does not constrain the proper interpretation of the statute. *See* 166 Or App at 85. With respect, Chief Judge Deits simply is incorrect.

The prior case law construed the term "disease" as it is used in the term "occupational disease." *Mathel* makes that point clear in concluding that the dictionary definition of the

term "disease" is consistent with what the court had said earlier in *James*, in which "this court considered the difference between 'injury' and 'disease' under the Workers' Compensation Law." *Mathel*, 319 Or at 240. Thus, we have conflated nothing, but rather have adhered to the definitional distinctions that are clearly described in the relevant cases.

In a similar vein, Chief Judge Deits complains that we have ignored the definition of "disease" adopted by the Supreme Court in *Mathel*. 166 Or App at 85-86. To the contrary, we have cited and applied *Mathel*, which held that the dictionary definition of the term "disease" that it described was entirely consistent with the definition that it had applied in *James*. *Mathel*, 319 Or at 240. Indeed, if the definition of "disease" adopted by the court in *Mathel* did not change the law—as the court itself took pains to emphasize—we are hard pressed to understand how the decision somehow frees us from the constraints of prior definitions of occupational "disease," as Chief Judge Deits suggests.

We conclude that the Board did not err in holding that claimant's condition must be analyzed as an occupational injury under ORS 656.802(1)(a)(A).

Affirmed.

**DEITS, C. J.,** dissenting.

As the majority acknowledges, this case presents a close question of law. In my view, however, after considering the text and context of the pertinent statute, the Board's dissenting opinion has the better argument.

The question here is whether the compensability of claimant's condition should be assessed as an injury, under ORS 656.005(7)(a)(B), or as an occupational disease under ORS 656.802(2)(b). As the majority points out, that makes a significant difference here because, if the compensability of the claim is assessed as an injury, claimant must prove that his work activity was a material contributing cause of his disability or need for treatment of the combined condition. On the other hand, if the claim is assessed as an occupational disease, claimant faces the more difficult burden of proving that his work activity was the major contributing cause of the

combined condition and the pathological worsening of the disease.

The statutory language that we must interpret, ORS 656.802(1), provides:

"(1)(a) As used in this chapter, 'occupational disease' means any disease or infection arising out of and in the course of employment caused by substances or activities to which an employee is not ordinarily subjected or exposed other than during a period of regular actual employment therein, and which requires medical services or results in disability or death, including:

"(A) Any disease or infection caused by ingestion of, absorption of, inhalation of or contact with dust, fumes, vapors, gases, radiation or other substances.

"(B) Any mental disorder, whether sudden or gradual in onset, which requires medical services or results in physical or mental disability or death.

"(C) Any series of traumatic events or occurrences which requires medical services or results in physical disability or death.

"(b) As used in this chapter, 'mental disorder' includes any physical disorder caused or worsened by mental stress."

The majority concludes that, although the term "disease" is not defined in ORS chapter 656, well accepted definitions of the terms "occupational injury" and "occupational disease" have developed in our case law. Under those definitions, the decision whether a condition is a disease or an injury depends on whether the symptoms of the condition are gradual or sudden in onset. The majority holds that, in order to come within the terms of ORS 656.802(1)(a)(A), a condition must satisfy the definition of occupational disease found in the case law. In other words, in order to be considered an occupational disease under ORS 656.802(1)(a)(A), the symptoms of the condition must have been gradual in onset. Here, of course, the symptoms were sudden in onset and, consequently, under the majority's view, the claim must be assessed as an occupational injury under ORS 656.005-(7)(a)(B).

The majority's holding is a plausible reading of the statutory language. However, in my opinion, the text and context of the statute support a different understanding of what is included as an occupational disease under this subsection of the statute. First, looking at the text of the statute, an occupational disease is defined by the *entire* subsection. That includes both the general definition set out in subsection (1)(a) as well as the three specific categories included in subsections (A) through (C) of subsection (1)(a). One of those categories is, of course, the one at issue here, which specifically includes as an occupational disease:

> "(A) Any *disease* or infection caused by ingestion of, absorption of, inhalation of or contact with dust, fumes, vapors, gases, radiation or other substances."

ORS 656.802(1)(a)(A) (emphasis added).

The majority's interpretation of the term "disease," as used in subsection (1)(a)(A), gives it the same meaning as the term "occupational disease" as generally used in our case law. The majority is essentially defining the term "occupational disease," as used in subsection (1)(a), by using the term "occupational disease." It seems unlikely that that is what the legislature intended. Further, under the majority's interpretation of "disease," as used in ORS 656.802(1)(a)(A), the remaining language of the subsection becomes completely unnecessary because a condition that is gradual in onset and caused by dust, fumes, vapors, gases, radiation, or other substances, is already covered by the general definition of an occupational disease. Presumably, by adding the language listing specific categories of conditions to be included in the general definition of occupational diseases, the legislature meant to add conditions that may not otherwise come within the general definition of "occupational disease" as found in ORS 656.802(1)(a).

The majority appears to believe that it has no other choice but to use the definition of occupational disease found in our case law. However, in addition to the fact that, as discussed above, the legislature included language adding specific categories to the definition, the majority's definition of "disease" is not the only definition of "disease" available. As the dissenting opinion of the Board points out, in the

Supreme Court's decision in *Mathel v. Josephine County*, 319 Or 235, 875 P2d 455 (1994), in discussing whether the condition there was a "disease" or an "injury," the court used the definition of disease found in *Webster's Third New Int'l Dictionary* (unabridged ed 1993), which defines a disease as:

> "any impairment of the normal state of the living animal or plant body or any of its components that interrupts or modifies the performance of the vital functions, being a response to environmental factors (as malnutrition, industrial hazards, or climate) * * *."

*Id.* at 648.

As the Supreme Court did in *Mathel*, it is reasonable here to interpret the term disease as used in ORS 656.802(1)(a)(A) in this general sense. That understanding of the term is completely consistent with the text and context of the statute. In adding subsections (A) to (C) to ORS 656.802(1)(a), it is apparent that the legislature intended to require that the categorization of certain types of conditions as occupational diseases or occupational injuries be determined differently from the traditional analysis, which focuses on whether the onset of the injury is gradual or sudden. The language of subsection (A) clearly indicates that, with respect to conditions caused by the ingestion, absorption, contact with or inhalation of specified substances, the legislature intended the focus to be on the *cause* of the condition.

In *Mathel,* the Supreme Court recognized exactly that. It stated that there are some conditions for which the categorization of the condition as a disease or an injury does depend on the cause of the condition, citing ORS 656.802(1)(a)(A). The court stated:

> "Under the Workers' Compensation Law as a whole—that is, with respect to both 'injury' claims and 'occupational disease' claims—workers make claims for accidental injuries or occupational diseases, not for the causes of those accidental injuries or occupational diseases. *See* ORS 656.005(7)(a) (providing in part that a 'compensable injury' is an accidental injury meeting certain criteria); ORS 656.802 (providing

in part that an 'occupational disease' is a disease or infection meeting certain criteria). *Some provisions of the Workers' Compensation Law expressly describe certain causes, which are differentiated from the concepts of 'compensable injury' and 'occupational disease.' See* ORS 656.005(7)(b) ('compensable injury' does not include injuries caused by various activities such as consumption of alcoholic beverages); ORS 656.802(1)(a) *('occupational disease' includes diseases or infections caused by ingestion, absorption or inhalation of, or contact with, various substances)."*

*Id.* at 242 (emphasis added).

My interpretation of ORS 656.802(1)(a)(A) is also supported by the fact that the Supreme Court reached a similar conclusion with respect to subsection (B) of ORS 656.802(1)(a). In *Fuls v. SAIF*, 321 Or 151, 894 P2d 1163 (1995), the claimant was seeking compensation for a mental disorder that he alleged was caused by a distinct work incident. The claimant attempted to rely on the general case law distinction between occupational injuries and diseases in arguing that his condition should be analyzed as an injury. The court rejected that argument, concluding that the definition of an occupational disease in ORS 656.802(1)(a)(B) included any mental disorder without regard to the suddenness of the condition's onset:

"Claimant argues that, despite the language of ORS 656.802, a 'sudden onset injury in the form of a mental disorder' should not be analyzed under ORS 656.802 but, rather, should be treated as an 'injury,' as defined in ORS 656.005(7). It is true that this court's cases have drawn a distinction between occupational diseases and occupational injuries along the lines that occupational diseases are gradual rather than sudden in onset. *See, e.g., James v. SAIF*, 290 Or 343, 624 P2d 565 (1981) (so indicating); *see also Mathel*, 319 Or at 240-42, (citing *James*, noting that heart attack was sudden onset condition, and rejecting argument that it was an occupational disease). However, ORS 656.802(1)(b) specifically includes '[a]ny mental disorder' within the definition of 'occupational disease,' without regard to the suddenness of its onset."

*Fuls*, 321 Or at 158.

The majority acknowledges the holding in *Fuls,* but concludes that subsection (A) is different from subsection (B), because subsection (A) refers to "any disease" while subsection (B) does not. As discussed above, the majority reasons that, by using the term disease in subsection (A), the legislature intended that we must use the accepted case law definition of disease. However, for the reasons discussed above, we are not compelled to use that definition in interpreting subsection (B). The court's reasoning in *Fuls,* that the specific categories of conditions included in subsections (A) through (C) of ORS 656.802(1)(a) are *part of* the definition of an occupational disease under that statute, is directly applicable here. Under ORS 656.802(1)(a)(A), conditions caused by the ingestion, inhalation, absorption or contact with certain substances are occupational diseases regardless of the suddenness of the onset of the condition.

The final point that the majority relies on to support its conclusion is the fact that, in 1995, the legislature added the language "whether sudden or gradual in onset" to subsection (B). The majority reasons that, because similar language was not added to subsection (A), that subsection may not be read to include conditions with symptoms that are sudden in onset. However, as the Board's dissenting opinion notes, the addition of this language was essentially meaningless because the court, in *Fuls,* had already concluded before the language was added that the subsection included conditions where the onset was sudden.

I would hold that ORS 656.802(1)(a)(A) applies to any claim for a condition caused by the ingestion, absorption, inhalation or contact with dust, fumes, vapors, gases, radiation or other substances, regardless of the onset of the condition. Consequently, in my view, the claim here must be analyzed as an occupational disease. Because claimant here did not establish a compensable occupational disease, I would reverse the Board and uphold the employer's denial. For all of the above reasons, I respectfully dissent.