Argued and submitted June 20, 2002, reversed and remanded for reconsideration on petition; affirmed on cross-petition July 2, 2003

In the Matter of the Compensation of
George D. Smirnoff, Claimant.

George D. SMIRNOFF,
*Petitioner - Cross-Respondent,*

*v.*

SAIF CORPORATION
and Christenson Electric,
*Respondents - Cross-Petitioners.*

99-06222; A112328

72 P3d 118

Edward J. Harri argued the cause for petitioner - cross-respondent. With him on the briefs was J. Michael Casey.

David L. Runner, Appellate Counsel, argued the cause and filed the brief for respondents - cross-petitioners.

Before Edmonds, Presiding Judge,* and Deits, Chief Judge, and Kistler, Judge.

* Edmonds, P. J., *vice* Warren, S. J.

DEITS, C. J.

**DEITS, C. J.**

Claimant seeks review of an order of the Workers' Compensation Board (board) holding that his knee condition should be considered an injury rather than an occupational disease and that, consequently, his condition is not compensable because there is no medical evidence supporting the compensability of the claim as an injury. Employer has filed a cross-petition, asserting that the board erred in determining that claimant is an Oregon subject worker. We affirm without discussion the board's determination that claimant is an Oregon subject worker. We conclude, however, that the board erred, as a matter of law, in its determination that claimant's knee condition should be treated as an injury. Accordingly, we remand the case to the board for reconsideration.

Approximately 20 years ago, claimant had arthroscopic surgery on his right knee to repair an injury resulting from a motor vehicle accident. The surgery was successful, and, until June 11, 1999, claimant's knee was symptom free. Claimant has worked as an electrician for a number of years and for employer since 1997. His work for employer involved repetitive bending, kneeling, and squatting. On June 11, 1999, while performing his work as an electrician for employer, claimant began experiencing right-knee symptoms after drilling holes for most of his work shift while kneeling without knee pads on a concrete floor. Claimant took the next day off but, after that, continued to work. However, the symptoms increased and, a few days later, he sought medical treatment.

Claimant sought medical treatment on four occasions from mid-June to mid-July. He eventually saw Dr. Hayes, an orthopedic surgeon, who opined that claimant had an "early degenerative disease of the knee associated with torn medial meniscus." Dr. Gripekoven, another orthopedic surgeon, provided an independent medical examination of claimant in July. He concluded that claimant's knee condition was caused by his work exposure combined with his preexisting degenerative condition, but opined that the condition was caused in major part by claimant's preexisting condition.

In October, claimant began treatment with Dr. Hormel, an orthopedic surgeon. On October 15, 1999, Hormel performed surgery on claimant's knee. Following the surgery, Hormel diagnosed a degenerative medial meniscus tear. Hormel saw claimant six times between October 1999 and January 2000. It was Hormel's opinion that the degenerative tear in claimant's medial meniscus was *not* caused by acute trauma or by claimant's activity on June 11. Rather, Hormel opined that claimant's work as an electrician caused a gradual breakdown of claimant's right-knee meniscus and was the major contributing cause of claimant's right-knee condition and the pathological worsening of his knee condition. Hormel explained:

> "I do feel that the repetitive bending and squatting in his knee over the course of seven years probably contributed to his degenerative changes and the degenerative meniscus tear."

SAIF denied claimant's claim for an occupational disease. Claimant requested a hearing, which was held on May 10, 2000. Relying primarily on Hormel's opinion, the administrative law judge (ALJ) concluded that claimant had established the compensability of his knee condition as an occupational disease. The ALJ explained:

> "Claimant's work activities as a commercial electrician including his work activities for the employer are the major contributing cause of claimant's right knee combined condition and pathological worsening of said condition, disability and need for treatment."

SAIF appealed the ALJ's decision to the board. The board reversed the ALJ on the ground that the claim was properly analyzed as an injury. The board stated:

> "The ALJ found claimant's right knee condition compensable as an occupational disease claim. SAIF argues that claimant's claim is not properly analyzed as an occupational disease because it was sudden in onset. We agree.

> "An occupational disease stems from conditions that develop gradually over time. ORS 656.802; *Mathel v. Josephine County*, 319 Or 235, 240, [875 P2d 455] (1994). In contrast, an injury is sudden, arises from an identifiable event, or has an onset traceable to a discrete period of time.

*Active Transportation Co. v. Wylie,* 159 Or App 12, 15, [976 P2d 94] (1999); *Valtinson v. SAIF,* 56 Or App 184, 188, [641 P2d 598] (1982).

"Here, it is undisputed that claimant's right knee symptoms began on June 11, 1999. Claimant had right knee arthroscopic surgery twenty years ago following a motor vehicle accident, but has not had any significant right knee symptoms until June 11, 1999. *Because the onset of claimant's right knee condition was sudden and occurred on a specific date, the claim is analyzed as an industrial injury.* No medical evidence in the record supports compensability of claimant's claim as an industrial injury. Accordingly, we conclude that SAIF's denial must be upheld."

(Emphasis added; footnote omitted.)

Claimant argues that the board erred, as a matter of law, in denying the compensability of his claim on the basis that his claim must be analyzed as an injury rather than an occupational disease. Claimant argues specifically that the board erred in holding that the suddenness of the onset of his *symptoms* compelled the conclusion that the claim must be analyzed as an injury. For the reasons that we will explain, we agree that the board erred.

In pertinent part, ORS 656.802(1)(a)(C) defines an occupation disease as any

"disease or infection arising out of and in the course of employment caused by substances or activities to which an employee is not ordinarily subjected or exposed other than during a period of regular actual employment therein, and which requires medical services or results in disability or death, including:

"\* \* \* \* \*

"(C)  Any series of traumatic events or occurrences which requires medial services or results in physical disability or death."

ORS 656.005(7)(a) defines an injury as follows:

"A 'compensable injury' is an accidental injury, or accidental injury to prosthetic appliances, arising out of and in the course of employment requiring medical services or resulting in disability or death; an injury is accidental if the

result is an accident, whether or not due to accidental means, if it is established by medical evidence supported by objective findings * * *[.]"

As we and the Supreme Court have consistently articulated in cases involving a determination of whether a claim involved an injury or occupational disease, an occupational disease results from conditions that develop gradually over time, rather than suddenly. *Mathel*, 319 Or at 240; *Lecangdam v. SAIF*, 185 Or App 276, 59 P3d 528 (2002); *Weyerhaeuser Co. v. Woda*, 166 Or App 73, 998 P2d 226, *rev den*, 330 Or 361 (2000); *Active Transportation Co.*, 159 Or App 12; *Donald Drake Co. v. Lundmark*, 63 Or App 261, 663 P2d 1303 (1983), *rev den*, 296 Or 350 (1984). As we explained in *O'Neal v. Sisters of Providence*, 22 Or App 9, 16, 537 P2d 580 (1975),

"Larson synthesizes the occupational disease-accidental injury dichotomy when he notes that there are 'two crucial points of distinction' between accidental injuries and occupational diseases: the elements of 'unexpectedness' and 'time-definiteness.' He explains these distinctions as follows:

" '* * * What set[s] occupational diseases apart from accidental injuries [is] both the fact that they can[not] honestly be said to be unexpected, since they [are] recognized as an inherent hazard of continued exposure to conditions of the particular employment, and the fact that they [are] gradual rather than sudden in onset.' (Footnotes omitted.)"

(Omissions and bracketed material in original.)

In examining whether the requisite suddenness exists to require that a claim be considered an injury, it is important to keep in mind that there are two aspects to "suddenness": suddenness in the onset of the condition and suddenness in the onset of the symptoms. Arthur Larson, *Workers' Compensation Law* § 52.03, 52-6 (2002). Frequently, the two coincide. When the onset of the symptoms and of the condition coincide, the analysis and outcome are relatively straightforward. Our decision in *Jeld-Wen, Inc. v. Molena*, 166 Or App 396, 998 P2d 753, *rev den*, 330 Or 363 (2000), provides a good example of the analysis in such a circumstance.

In that case, the claimant was exposed to vapors from overheated glue at the employer's business on a certain day. The claimant immediately began to experience headaches and nausea and eventually passed out. A week later, the claimant was admitted to the hospital because of chest discomfort and shortness of breath. The claimant had a preexisting chronic pulmonary disease. Nonetheless, the ALJ found, and the board agreed, that the claim was properly analyzed as an injury and that work exposure was the major contributing cause of the need for treatment of the combined condition.

On judicial review, the employer argued that the claimant's condition was an occupational disease, not an injury, because, in its view, ORS 656.802(1)(a)(A)[1] required, as a matter of law, that the claimant's lung condition be treated as an occupational disease. Citing *Weyerhaeuser Co.*, we rejected that statutory argument. *Jeld-Wen, Inc.*, 166 Or App at 399. The employer also argued that the evidence demonstrated that the claimant's "condition arose gradually" and, thus, was an occupational disease. We held that there was substantial evidence to support the board's finding that the claimant's *condition* occurred suddenly. *Id.* at 400. Notably, in determining if the condition was an injury or disease, our focus was on the onset of the claimant's *condition*. We did not treat our discussion of the onset of the symptoms as dispositive but rather as one consideration in determining the nature of the onset of the condition.

Similarly, in *Valtinson*, the onset of the claimant's condition and symptoms coincided. In that case, the claimant had experienced back problems some 12 years earlier but had been completely free of symptoms until he drove a truck for the employer from Grants Pass to Portland and back. During that discrete time period, the claimant developed a pinched

---

[1] ORS 656.802(1)(a) provides, in part:

"As used in this chapter, 'occupational disease' means any disease or infection arising out of and in the course of employment caused by substances or activities to which an employee is not ordinarily subjected or exposed other than during a period of regular actual employment therein, and which requires medical services or results in disability or death, including:

"(A) Any disease or infection caused by ingestion of, absorption of, inhalation of or contact with dust, fumes, vapors, gases, radiation or other substances."

nerve and experienced severe pain. We concluded that the claim was an injury. Again, the focus was on the onset of the claimant's *condition*. The onset of symptoms, although relevant to the injury, was not determinative as to whether the condition was an injury or disease. As we explained,

"[t]he injury was sudden, in that it affected claimant in only a matter of hours. The evidence pointed to no instantaneous event that caused his *pinched nerve*. The distinction between disease and injury, described in *James v. SAIF*, [290 Or 343, 624 P2d 565 (1981)], is based in part on whether there is a *sudden onset of the condition* as opposed to a gradual one. We do not equate 'sudden onset' with instantaneous. It is clear that the injury from the physical stress of driving the van occurred during a discrete period, as compared to the onset of an occupational disease over a long period of time. Both examining physicians linked claimant's *condition* to work activity. We are satisfied that claimant's drive to Portland on June 21, 1980, was an injurious event."

*Valtinson*, 56 Or App at 188 (emphasis added; citations omitted); *see Debrito v. SAIF Corp.*, 319 Or 244, 875 P2d 459 (1994); *Donald Drake Co.*, 63 Or App at 266.

There are also numerous cases in which the onset of a condition and the symptoms of the condition have both developed gradually. In those cases, we have determined that the claim is properly analyzed as an occupational disease claim. Our decision in *O'Neal* is an example of such a case. In that case, the claimant worked as a maid at a hospital and was required to push a heavy cart as part of her job. She developed problems in both legs over a period of four years. We concluded that her disability resulted from an occupational disease, rather than an injury. We explained:

"It could not honestly be said that it is unexpected that leg muscle spasms might develop from extensive pushing and pulling of a large, maid's cart. It also is clear that the muscle problems were gradual in onset. We therefore conclude that claimant's disability resulted from an occupational disease rather than an accidental injury."

*O'Neal*, 22 Or App at 17.

The question of whether a claim involves an injury or a disease becomes more difficult when the onset of the condition and the onset of symptoms do not coincide. That is the case here. Although it is undisputed that claimant's symptoms first appeared on June 11, the medical evidence consistently indicates that claimant's meniscal tear developed gradually. There is no medical evidence indicating that the *condition* that became symptomatic on June 11 arose suddenly or as a result of a traumatic event. The dispute in the medical evidence is over whether the major contributing cause of claimant's condition was his preexisting condition or his ongoing work activities.

It is claimant's position that the board erred in concluding that the sudden onset of his *symptoms* required it to conclude that the claim was for an injury, despite the fact that the medical evidence shows that the onset of the condition was gradual. SAIF, on the other hand, argues that the board's analysis was correct that the focus of the inquiry should be on when the manifestation of the symptoms occurred, specifically, whether the symptoms of the condition came on suddenly or gradually.

We agree with claimant that the onset of the condition is the determining factor in deciding if a claim is for an injury or a disease. The onset of symptoms is frequently quite relevant in evaluating the nature of the onset of the condition. However, the degree of the relevance of the onset of symptoms to determine the nature of the onset of the condition will vary depending on the circumstances, in particular the nature of the condition. We agree with claimant that, in this case, the board erred as a matter of law in equating the onset of symptoms with the onset of the condition without any analysis of the medical evidence relating to the onset of the condition itself.[2]

---

[2] SAIF argues that the question before us is whether there is substantial evidence to support the board's finding that the onset of the symptoms was sudden. Although the question of whether the onset of symptoms was sudden is a question of fact that we review for substantial evidence, as we have discussed above, that is not the decisive question presented here. Rather, the critical issue is whether, under these facts, including the fact that claimant's symptoms were sudden in onset, claimant's claim is for an injury or an occupational disease. That question presents an issue of law.

We recognize that there is language in a few decisions that does appear to focus on the onset of the claimant's symptoms in resolving whether a claim is for a disease or an injury. SAIF relies on one of those cases, *Mathel*, to support the proposition that it is the manifestation of symptoms that is the determining factor.

In *Mathel*, the claimant sought to have a heart attack that allegedly resulted from on-the-job mental stress treated as an occupational disease. The Supreme Court concluded that the heart attack was an injury. *Mathel*, 319 Or at 242. *Mathel* is legally and factually distinguishable from this case, however. In *Mathel*, the court first rejected the argument that the claimant's claim for his heart attack caused by on-the-job stress had to be treated as an occupational disease because, under ORS 656.802, any claim for a condition caused by on-the-job stress must be analyzed as an occupational disease. The court explained that an injury involves an event, as distinct from an ongoing condition or state of the body or mind. It concluded that a heart attack is an event and, therefore, an injury. The court rejected the view that the cause of the heart attack should be considered in deciding whether the heart attack itself is an injury or disease. In the court's view, the heart attack itself, not the causation, was the compensable condition. Therefore, it held that the provisions of ORS 656.802, requiring any claim for a condition caused by on-the-job stress to be analyzed as an occupational disease claim, were not applicable. This case is distinguishable from *Mathel* not only because it does not involve a dispute about a similarly applicable statute but also because there is no question here that the claim is for claimant's knee condition, which the evidence demonstrates is an ongoing condition or state of the body.

Employer also relies on our decision in *Weyerhaeuser Co.* for the proposition that whether a given condition is a disease or an injury requires examination of whether the *symptoms* of the condition were sudden or gradual in onset. There is language in *Weyerhaeuser Co.* that could be so understood. 166 Or App at 81. As we will explain, however, *Weyerhaeuser Co.* involved circumstances in which the onset of symptoms and the onset of condition coincided. To the extent that the language we used in *Weyerhaeuser Co.* was imprecise in

focusing on the onset of claimant's symptoms, rather than the onset of the condition, to determine the nature of the claim, we disavow it.

Our decision in *Weyerhaeuser Co.* also involved a statute with limited application to certain kinds of conditions. In that case, the question was whether the claimant's respiratory condition, a sudden allergic reaction to wood dust in his workplace, was an injury or an occupational disease. At the time, as now, ORS 656.802(1)(a)(A) defined an occupational disease to include "[a]ny disease or infection caused by ingestion of, absorption of, inhalation of or contact with dust, fumes, vapors, gases, radiation or other substances." The employer sought to have the claimant's condition treated as an occupational disease, asserting that the condition, whether gradual or sudden in onset, that was caused by inhalation of dust or the other substances, was encompassed within the terms of the statute. We reasoned, however, that the subsection could not be read in isolation from the term "disease," which was not defined in the statute, but which through case law had acquired a "definitional patina." We quoted the Supreme Court's statement in *Mathel* that "[w]hat set[s] occupational diseases apart from accidental injuries [is] * * * the fact that they * * * [are] gradual rather than sudden in onset." *Weyerhaeuser Co.*, 166 Or App at 79 (internal quotation marks omitted). In our discussion, we rejected the employer's contention that all conditions brought on by inhalation must be treated as occupational diseases. Rather, we said "whether a given condition is a disease or an injury requires examination of whether the symptoms were sudden or gradual in onset." *Id.* at 81. We affirmed the board's order, holding that the claimant's claim should be treated as an injury because the onset of the claimant's respiratory condition was sudden and not gradual in onset.

Our conclusion in *Weyerhaeuser Co.* was correct in light of the nature of the condition for which compensation was sought, which the board described as "an immediate reaction to exposure to wood dust." As discussed above in *Weyerhaeuser Co.*, the onset of the condition and its symptoms essentially coincided. Accordingly, the onset of the symptoms was highly relevant to determining the onset of the condition. However, to the extent that *Weyerhaeuser Co.*

might be understood to stand for the rule that the onset of symptoms necessarily is dispositive of the nature of the onset of the condition, that understanding is incorrect. The proper inquiry is whether the condition itself, not its symptoms, occurred gradually, rather than suddenly. *See Lecangdam*, 185 Or App at 280; *Jeld-Wen, Inc.*, 166 Or App at 399. We would note that, because the onset of the symptoms and the condition in *Weyerhaeuser Co.* coincided, to the extent our focus on the onset of claimant's symptoms was incorrect, it made no difference in the outcome of the case.

Here, unlike in *Weyerhaeuser Co.*, the onset of claimant's symptoms must be viewed in the context of his separately diagnosed *condition*, a torn medial meniscus. In determining whether that condition should be characterized as an injury or an occupational disease, the inquiry is whether the *condition* developed gradually or as the result of a discrete event. As discussed above, the medical evidence here permits the conclusion that the *condition*, whether or not it was related to the employment, developed over time. In holding that the suddenness of the onset of claimant's symptoms must necessarily result in the conclusion that the onset of claimant's condition was sudden, the board committed legal error. We therefore reverse and remand the case to the board for reconsideration of the claim.[3]

Reversed and remanded for reconsideration on petition; affirmed on cross-petition.

---

[3] Claimant also argues that the board's order is inadequate for judicial review because the board failed to include reasons that explain how the facts support the legal conclusions that it reached. In view of our disposition of this case, it is not necessary to resolve that question.