Argued and submitted July 19, 1999; resubmitted en banc May 10, reversed
October 4, 2000

In the Matter of the Compensation of
Geoffrey R. Lewis, Claimant.

SAIF CORPORATION
and Oregon State University,
*Petitioners,*

*v.*

Geoffrey R. LEWIS,
*Respondent.*

(97-04909; CA A103052)

12 P3d 498

David L. Runner, Special Assistant Attorney General, argued the cause and filed the brief for petitioners.

Robert J. Thorbeck argued the cause and filed the brief for respondent.

Before Deits, Chief Judge, and Edmonds, De Muniz, Landau, Haselton, Armstrong, Linder, Wollheim and Brewer, Judges.

LINDER, J.

Wollheim, J., dissenting.

## LINDER, J.

Employer seeks judicial review of a Workers' Compensation Board (Board) order concluding that claimant's claim for a "toxic exposure condition" is compensable. The compensability issue centers on the meaning and application of the statutory requirement that the claim must be "established by medical evidence supported by objective findings." ORS 656.005(7)(a); ORS 656.802(2)(d). We conclude that the requirement of "objective findings" is not satisfied if a medical expert merely listens to a patient's description of his or her symptoms and, believing the patient and without any verification process, relies on that description to form a diagnosis. We also conclude that, in this case, claimant failed to present "medical evidence supported by objective findings" to establish his claim. We therefore reverse the Board's order.

The Board found the following facts:

"Claimant worked as a bioscience research technician for [employer]. On February 11, 1997, claimant's work involved cleaning a building which contained insecticides, herbicides and fungicides in liquid, powder and granular forms. Claimant and his co-workers moved the chemicals and cleaned the room. Claimant also scraped paint from the ceiling and walls to prepare them for repainting. The room was dusty and the work stirred up dust.

"Claimant wore protective clothing, including a charcoal respirator mask. The mask leaked. Claimant also wore goggles part of the time, but he took them off when they became fogged.

"During the job, claimant experienced fatigue and eye irritation. At about 3 p.m., after working, claimant felt 'flat,' disoriented, confused, and 'funny in the eyes.' He experienced eye irritation, tearing, coughing, and wheezing on his way home. That evening, claimant noticed a 'yellowish-whitish' powder in his nostrils. He had difficulty concentrating. By the next morning, claimant had a sore throat, sore neck, fatigue, dizziness, tinnitus, headache, sinus congestion, bright yellow phlegm and sputum, a chemical taste in his mouth, and vision abnormalities."

Claimant did not seek medical attention until three weeks after his February 11, 1997, exposure. On March 3,

1997, he saw Dr. Huff, who noted that claimant reported "persistent [symptoms] of Tinnitus, [headache] and fatigue primarily." Huff observed that the case was a "difficult one to assess as there's no objective data." He referred claimant to Dr. Stringham, an industrial medicine specialist.

Stringham saw claimant only once, on March 4, 1997. In the "subjective" portion of his report, Stringham recounted claimant's description of his symptoms, which had "mostly subsided" by that time:

> "By the next day [after the exposure], [claimant] had a mild headache, sense of malaise, weakness, and difficulty concentrating. He had a pressure in his head and his sinuses. He noted ringing in the ears. He had a sore throat. He felt like he was disoriented at times. He felt on the morning of 02/12/97 he brought up some yellow sputum and then blood tinged sputum later in the day. On 02/12/97, he returned to the area [where he had been exposed] and painted with spray paint the next day. Over the next few days, he developed fatigue, anorexia, difficulty concentrating. Although he didn't feel well, he presumed the symptoms would subside. He continued to have malaise, tinnitus, headache, sinus ache, through the following week of 02/17/97 through 02/21/97. By 02/21/97, he started to feel more normal, although he still had some tinnitus and still felt some pressure in the back of the head around the right ear. He still had a mild headache."

In the "objective" portion of his report of his examination of claimant, Stringham noted that claimant was "in no acute distress." Claimant's sinuses were "nontender." His hearing was "normal to normal conversation." All laboratory results were normal, except for "an elevated bilirubin total for reasons unclear, but possibly related to the exposure." Stringham's "assessment" of claimant's condition was "[t]oxic exposure to multiple chemicals." Stringham further noted that claimant was "getting better spontaneously."

Later, Stringham reported that, when he saw claimant in early March 1997, claimant was "feeling that he had recovered about 70%." Stringham believed that claimant was "entirely credible." He reported:

"On a clinical basis he has an exposure. He developed symptoms in a time frame consistent to the exposure. The symptoms have resolved. In my mind it is far more probable on a medical basis that the exposure, given the chemicals involved and the circumstances of his exposure, is the cause of the symptoms."

Stringham concluded "to a reasonable medical probability" that claimant's symptoms, "including visual changes, malaise, tinnitus, and headache were related to his toxic exposure on February 11, 1997."

In May 1997, claimant saw Drs. Quarum, Berlin, and Burton, all specialists in occupational and environmental toxicology. Quarum directed that an audiogram be performed on claimant, which showed normal hearing in both ears. Quarum concluded that "[t]here [was] no evidence that [claimant] actually had a specific or toxic exposure, and there [was] also no correlation of his tinnitus with any of the chemicals that he was exposed to based on the information provided." Quarum's "best guess" as to the etiology of claimant's tinnitus, "given his negative audiologic history," was "possibly due to Aspirin, which is well known as a salicylate to cause tinnitus." Claimant admitted taking aspirin "on a regular basis," although the amounts he said he took "would not be considered sufficient to cause this condition unless he actually is taking quite a bit more." Burton and Berlin concluded that claimant's complaints were not work-related and more likely were due to some other medical condition that coincided with the possible toxic exposure at work. Quarum and Burton both suggested that any link between claimant's symptoms and his possible exposure to toxic chemicals was based solely on conjecture.

SAIF denied the claim, and claimant requested a hearing. Following the hearing, the administrative law judge (ALJ) concluded that claimant had not proved the compensability of his claim. The ALJ viewed the case as a battle of the experts regarding the causal link between claimant's work and the symptoms that he experienced. The ALJ determined that Stringham's opinion supporting compensability was insufficient because of a "vacuum in the medical literature" regarding the effects of exposure to the multiple chemicals to which claimant was exposed.

On review, a divided Board reversed. The Board rejected the ALJ's conclusion that proving compensability necessarily requires support from "medical literature." The Board determined that Stringham's opinion was "more persuasive than those of Drs. Berlin, Burton, and Quarum" because Stringham's "reasoning and conclusions are based on a more accurate history and are more consistent with claimant's clinical course[.]" The Board also rejected employer's contention that claimant had not produced "medical evidence supported by objective findings." ORS 656.005(7)(a); ORS 656.802(2)(d). In rejecting that contention, the Board reasoned:

> "[Employer] argues that claimant's headache, tinnitus, and fatigue symptoms were not verifiable objective findings under ORS 656.005(19). We agree with regard to those symptoms. However, we note that Dr. Stringham reported: 'On a clinical basis, [claimant] has an exposure.' Dr. Stringham's opinion in this regard is supported by claimant's additional symptoms, which included irritated eyes, sinus congestion, and production of bright yellow phlegm and sputum. Because the latter symptoms are observable and verifiable, they are 'objective' under the statute."

(Record citations omitted.)

A dissenting Board member maintained that any evidence of the existence of claimant's symptoms was "purely subjective."

> "There are no examination findings which would qualify as objective findings in this record. To the contrary, Dr. Huff, who first examined claimant, reported '[t]his is a difficult one to assess as there's no objective data.'
>
> "Claimant was next examined by Dr. Stringham, who had multiple tests performed. The results of the tests were all normal. Dr. Stringham further noted 'no significant ongoing problems' other than the subjective symptoms previously noted.
>
> "Because no medical expert made findings which were 'reproducible, measurable, or observable,' [see ORS 656.005(19),] claimant's claim must fail for lack of objective findings *supporting* the medical evidence relating the alleged need for treatment to the work exposure. Based on

this record, claimant's reporting alone is insufficient to sat-isfy the statute's requirement for objective findings 'in sup-port of medical evidence.' "

(Emphasis in original; record citations omitted.) The dissent also would have concluded that the claim was not compensa-ble because it was not supported by a preponderance of the medical evidence.

On review, employer relies on both of the points made in the Board's dissenting opinion. That is, employer argues that the claim in this case was not "established by medical evidence supported by objective findings" and that the Board erred in relying on Stringham's opinion because it is based on what employer calls "medical speculation of a work-related cause." Because we agree with the first conten-tion, we do not reach the second.[1]

In making its first contention, employer frames the issue as a legal one: whether a claimant's description of his or her symptoms—a description accepted by a physician but not verifiable by the doctor's observations, tests, or measure-ments—alone can amount to "objective findings" that sup-port medical evidence. So framed, the issue turns on statu-tory interpretation. Claimant does not respond directly to employer's argument. Without attempting to articulate the applicable legal standard, claimant merely "disagrees with [employer's] characterization of the record" and argues that substantial evidence supports the Board's conclusion that claimant produced "medical evidence supported by objective findings" in this case.[2] We begin by identifying the correct

---

[1] The dissent inappropriately assumes the answer to employer's second con-tention when it weaves into its reasoning "the fact that [claimant's] responses fit a medically recognized pattern." 170 Or App at 217 (Wollheim, J., dissenting). Whether that conclusion can be drawn based on Stringham's support for his opin-ion is in contention in this case.

[2] The Board considered this to be a claim for occupational disease. Claimant disputes the Board's characterization, arguing that a "sudden, acute physical reac-tion to exposure to a substance such as chemical dust is analyzed as an injurious event under ORS 656.005(7)(a) as opposed to an occupational disease under ORS 656.802." Recent decisions establish that, in certain circumstances, toxic substance exposure can result in a work "injury." *Jeld-Wen, Inc. v. Molena*, 166 Or App 396, 399, 998 P2d 753, *rev den* 330 Or 363 (2000) ("exposure to fumes, vapors, and the like may result in an injury as well as an occupational disease"); *Weyerhaeuser Co. v. Woda*, 166 Or App 73, 998 P2d 226, *rev den* 330 Or 361 (2000) (same). The dis-tinction ultimately is immaterial for purposes of the issue presented in this case,

legal standard and then turn to whether substantial evidence satisfies claimant's burden under that standard.

Both the injury and the occupational disease statutes require that a claim be "established by medical evidence supported by objective findings." ORS 656.005(7)(a); ORS 656.802(2)(d). ORS 656.005(19) defines the term "objective findings."

> " 'Objective findings' in support of medical evidence are verifiable indications of injury or disease that may include, but are not limited to, range of motion, atrophy, muscle strength and palpable muscle spasm. 'Objective findings' does not include physical findings or subjective responses to physical examinations that are not reproducible, measurable or observable."

To determine the meaning of the requirement that a claim be "established by medical evidence supported by objective findings" and of the meaning of the definition of "objective findings," we look first to the text and context of the pertinent provisions. *PGE v. Bureau of Labor and Industries,* 317 Or 606, 610-12, 859 P2d 1143 (1993).

The threshold requirement that a claim must be "established by medical evidence supported by objective findings" itself reveals the statute's emphasis on requiring a degree of certainty and reliability to prove a claim. The word "establish," for example, means "to provide strong evidence for" and to "determine exactly and with certainty."[3] "Evidence" means "an outward sign: indication: * * * something that furnishes or tends to furnish proof."[4] That much is familiar territory, in terms of what those words are readily understood to mean in common parlance. But the words are worth careful examination as a reminder that, in and of themselves, they are infused with the idea that proof to establish a claim must reflect confidence in the diagnosis rather than mere speculation or conjecture.

---

however. Proof of the compensability of both an occupational disease and an injury requires a claim to be "established by medical evidence supported by objective findings." ORS 656.005(7)(a) (injury); ORS 656.802(2)(d) (occupational disease).

[3] *Webster's Third New Int'l Dictionary,* 778 (unabridged ed 1993).

[4] *Id.* at 788.

The statute's use of the phrase "objective findings" is less familiar in that it is not commonly used in general day-to-day conversation. The legislature has, however, provided a specific definition for it, declaring that objective findings are "verifiable indications of injury or disease" that include, but are not limited to, "range of motion, atrophy, muscle strength and palpable muscle spasm." That part of the definition is replete with words conveying that the medical evidence must be supported by an empirical confirmation of the existence of an injury or disease. Indeed, a key term in the definition is the word "verifiable," meaning "capable of being verified" and "susceptible to the possibility of being either theoretically or actually proved true or false by reference to empirical facts."[5] In turn, "verify" in this context means "to prove to be true: establish the truth of: * * * to check or test the accuracy or exactness of: confirm the truth or truthfulness of by or as if by comparison with known data or a recognized standard."[6] Similarly, an indication is "something (as a signal, sign, suggestion) that serves to indicate,"[7] that is, "to point out or point to or toward with more or less exactness: show or make known with a fair degree of certainty."[8] Consistent with the statute's insistence on empirical support for proffered medical evidence, the "verifiable indications" listed as examples in the definition (*e.g.*, range of motion, atrophy, muscle strength and "palpable" muscle spasm) all are tangible or quantifiable signs or symptoms with potential diagnostic significance to a medical expert.

The statutory definition does not stop there, however. The second sentence goes on to define "objective findings" by declaring what they do not include. Specifically, they do not include physical findings or subjective responses to physical examinations that are not reproducible, measurable or observable. Again, the standard dictionary definitions of the key terms are telling. All of them have to do with determining, by reliable methods and standards, the existence of a

---

[5] *Id.* at 2543.

[6] *Id.*

[7] *Id.* at 1150.

[8] The definition of "indicate" continues: "to show the probable presence or existence or nature or course of: give fair evidence of: be a fairly certain sign or symptom of: reveal in a fairly clear way * * * ‹a fever that indicates severe illness› ." *Id.*

state or condition through actual testing, scrutinizing, and ascertainment.[9] Thus, by converse implication, the second sentence adds the understanding that objective findings, to provide the necessary support for medical evidence, must be physical findings or subjective responses to examinations that are verifiable in the sense that they can be objectively or empirically confirmed.

To be sure, laboring through dictionary definitions can seem tedious and at times artificial. But the exercise is worthwhile here because it highlights the consistent nature of the terms that the legislature used to give meaning to the phrase "objective findings." Repeatedly, the legislature chose words that convey precision and reliability in empirically establishing the existence of an injury or disease based on an expert's actual examination and testing of the claimant.[10] That conclusion, moreover, is inescapable considering the broader statutory context. As already described, the starting point of the analysis is the requirement that a claim be "established by medical evidence *supported by* objective findings." ORS 656.005(7)(a) (emphasis added); ORS 656.802(2)(d) (same). Findings cannot logically be described as "supporting" particular medical evidence if the expert providing that evidence did not himself or herself make the findings or reasonably rely on some other qualified individual who did so.

■■    Our conclusions about the statutory language are reinforced by one other aspect of the context. Context includes not only case law, but earlier versions of the statute in question. *SAIF v. Walker,* 330 Or 102, 109, 996 P2d 979 (2000); *PGE,* 317 Or at 611. Based on an earlier version of the

---

[9] To "examine," for example, is to "test by an appropriate method," "to inspect or test for evidence of disease or abnormality," or to "seek to ascertain: attempt to determine." *Id.* at 790. To "reproduce" means "to produce again." *Id.* at 1927. "Observable" is defined as "perceptible directly or indirectly (as by the medium of instruments) through the senses." *Id.* at 1558. Finally, a thing is "measurable" if it is "capable of being measured," and "measure," in this context, is "to ascertain the quantity, mass, extent, or degree of in terms of a standard unit or fixed amount." *Id.* at 1399-1400.

[10] Indeed, the very term "objective" points to the need for an independent and qualified interpreter of the data or examination. *See id.* at 1556 ("objective," as applied to the "symptoms of disease" is "perceptible to persons other than an affected individual").

statutory definition of "objective findings," both the Board and this court held that a physician's acceptance of and reliance on a claimant's description of his or her symptoms, without more, could satisfy the "objective findings" standard. *SAIF v. Williamson*, 130 Or App 391, 395, 882 P2d 621 (1994), *rev den* 320 Or 507 (1995); *Georgia-Pacific Corp. v. Ferrer*, 114 Or App 471, 474, 835 P2d 949 (1992); *Suzanne Robertson*, 43 Van Natta 1505 (1991). After those decisions, the 1995 Legislature amended the statutory definition of "objective findings." Or Laws 1995, ch 332, § 1. The 1995 amendment added the requirement that "objective findings" be "verifiable indications of injury or disease." Apparently to place emphasis on the requirement that medically qualified individuals rely on perceptible indications of injury or disease, the 1995 Legislature also specified that a muscle spasm must be "palpable." Finally, the 1995 Legislature also added the sentence excluding physical findings or subjective responses to physical examinations that are not reproducible, measurable or observable from the definition of "objective findings." ORS 656.005(19).[11]

---

[11] Employer also relies on the history of the 1995 legislative amendment in urging that the statute does not permit findings based only on a claimant's subjective reports, rather than on objective and empirical confirmation of injury or disease. We consider legislative history only if the statutory "language is reasonably capable of more than one construction." *State v. Maxwell*, 161 Or App 468, 473, 984 P2d 361 (1999). Although we do not find that, for our purposes in resolving this case, the statutory language is reasonably capable of more than one construction, we nevertheless agree with employer that the legislative history also supports the conclusion that we reach here. *See State v. Sumerlin*, 139 Or App 579, 587 n 7, 913 P2d 340 (1996) (examination of text and context ended the inquiry but court nevertheless noted that legislative history also supported text and context reading). In particular, the history demonstrates that the 1995 Legislature intended to repudiate the Board's *Suzanne Robertson* decision and our similar decisions in *Williamson* and *Ferrer* by requiring, instead, that a medical expert see or otherwise observe or measure some objective indication of injury or disease.

The dissent's reliance on Representative Mannix's statement to the House Labor Committee (*see* 170 Or App at 216 n 3 (Wollheim, J. dissenting)) is misplaced for two reasons. First, it does not support what the dissent would hold—*i.e.*, that the term "verifiable" was understood by the legislature to mean capable of verification in the past rather than at the time of and via a physician's or other medically trained individual's objective examination. To the contrary, the passage cited supports exactly what we hold in this case—that a condition has to be *presently* verifiable and that a process of verification must be engaged in by the medical professional.

The discussion that the dissent quotes undermines the dissent's reasoning in a second way. As an example of the objective verification process in which a medical professional must engage, Representative Mannix cited the possibility that a

█    In short, all of the textual and contextual clues point in a single direction: The statutory emphasis is on findings made by a medical expert on the basis of a verification process involving trained observation, examination, or testing that produces results—either physical or subjective responses—that are witnessed, measured, or can be reproduced. For there to be "findings," a process of verification necessarily must take place. The plain import of the language is that the verifiable character of indications of injury or disease are established only if a medical expert engages in a medical examination process that results in their verification. Said another way, to satisfy the statute, the expert must attempt to verify the injury or disease, must succeed in doing so, and must make findings accordingly. Necessarily, then, the indications of an injury or disease must, at the time of the examination, be *presently* verifiable. That much of an understanding of the statutory language is enough to resolve this case.

█    We turn, then, to the Board's order and its application of the statute in this case. The Board first determined that claimant's "headache, tinnitus, and fatigue symptoms were not verifiable objective findings." The Board then nevertheless concluded that Stringham's opinion in favor of compensability was "supported by claimant's additional symptoms, which included irritated eyes, sinus congestion, and production of bright yellow phlegm and sputum." The Board did not explain how it distinguished between the symptoms that it found were "not verifiable objective findings" and those that it found were. The Board may have determined that Stringham actually observed or otherwise confirmed the existence of those theoretically observable symptoms. Alternatively, the Board may have considered those symptoms to

---

headache could be verified through brain scans or a claimant's description of a pain pattern that fits with what the medical profession accepts as indicative of a headache. The dissent ignores that the headache is not to be accepted by the medical expert at face value. Here, however, Stringham did the equivalent of that. Stringham asked nothing and did nothing to verify claimant's report of sinus congestion, discolored phlegm, mild headaches, and so on. He accepted those reports as credible and concluded that claimant had an injurious exposure because the symptoms were consistent with an exposure. The dissent accepts that backward reasoning and, in effect, lets the diagnosis serve as the verification. Nothing in the statute's language or its history supports that curious approach.

be "verifiable" indications of injury or disease because, unlike headache, tinnitus, and fatigue, which generally are subjective and must be reported by a patient, irritated eyes, sinus congestion, and discolored phlegm and saliva are at least "capable of verification" even if, in this case, Stringham did not personally observe them.

■ If the Board's decision rests on the former rationale—*i.e.*, that, factually, Stringham personally observed evidence of claimant's symptoms—the Board's finding is not supported by substantial evidence. *See Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990) ("If a finding is reasonable in light of countervailing as well as supporting evidence, the finding is supported by substantial evidence."). Nothing in the record indicates that Stringham himself—or any other qualified medical expert on whom he relied—observed, measured or reproduced claimant's reported symptoms. Indeed, to the contrary, Stringham's report observed that at the time of his examination, claimant's symptoms had "resolved." The "subjective" portion of Stringham's examination report merely summarized claimant's description of those symptoms. In the "objective" portion of Stringham's report, his only finding was the "elevated bilirubin total," which he could say only was due to "reasons unclear, but possibly related to the [toxic] exposure." Proof of compensability requires more than a speculative possibility. *Paige v. SAIF*, 75 Or App 160, 163, 706 P2d 575 (1985). Stringham's reference to the elevated bilirubin level, therefore, does nothing to prove the compensability of this claim.

Alternatively, the Board may have reasoned that Stringham's medical opinion was based on verifiable indications of injury or disease because the symptoms would have been verifiable when claimant was experiencing them, even though they had resolved by the time he sought medical treatment. If that rationale underlies the Board's finding, then the Board committed legal error because, as we have determined, the statute requires that the indications of disease or injury on which a medical expert relies be verifiable

at the time that the expert examines the claimant. Even setting aside the "reproducible, measurable or observable" requirement, at a minimum, the 1995 version of the statute mandates that there be either "physical findings or subjective responses to physical examinations." That language would be robbed of all meaning if it were deemed to include a claimant's report of once observable symptoms that have never been observable or otherwise objectively perceptible to an examining medical professional. *See* ORS 174.010 (in interpreting statute, court is not "to omit what has been inserted").

More to the point, the "reproducible, measurable or observable" requirement cannot be set aside. A claimant whose symptoms have resolved simply does not—indeed, cannot—present a medical expert with indications of disease or injury that presently are verifiable. Had this claimant sought medical treatment promptly, the symptoms on which the Board relied would have met the statutory requirements, assuming that the medical experts actually confirmed those symptoms and based their opinions on them. Stringham, however, necessarily based his findings on claimant's believability in later reporting those possibly once-verifiable symptoms. The statute simply does not permit such a "finding" to support a medical diagnosis, any more than a physician could find lost range of motion based only on a claimant's description of his or her physical limitations that, by the time of any medical examination, had resolved and were not then verifiable by the physician.[12]

■   In sum, the language of ORS 656.005(7)(a), ORS 656.802(2)(d), and ORS 656.005(19), as amended in 1995, compels the conclusion that a claimant's description of his or her own symptoms, including reported past symptoms that no longer are present, cannot alone constitute "objective" findings, even if believed and relied on by a medical expert.

---

[12] The dissent makes no effort to address this point. It is an important one. Based on even the most cursory review of the legislative history, no one could seriously contend that the legislature intended to permit objective findings on such a basis.

Because no "objective findings" support Stringham's opinion, which is the only medical opinion that favors compensability and the only opinion on which the Board relied, the Board erred in ruling that the claim is compensable.

Reversed.

**WOLLHEIM, J.,** dissenting.

Because I disagree with the majority's conclusion that ORS 656.005(19) requires that the indications of an injury or disease must be *presently* verifiable at the time of examination, I respectfully dissent.[1]

ORS 656.005(19) provides:

" 'Objective findings' in support of medical evidence are *verifiable* indications of injury or disease that may include, but are not limited to, range of motion, atrophy, muscle strength and palpable muscle spasm. 'Objective findings' does not include physical findings or subjective responses to physical examinations that are not reproducible, measurable or observable." (Emphasis added.)

As the majority explains, the plain language meaning of "verifiable" includes "capable of being verified" and "susceptible to the possibility of being either theoretically or actually proved true or false by reference to empirical facts[.]" *Websters Third New Int'l Dictionary*, 2543 (unabridged ed 1993). Neither meaning requires that verification by the physician take place, only that verification is possible at some time. However, the majority's interpretation of ORS 656.005(19) requires that the findings of injury be *presently* verifiable. That interpretation inserts a term—and consequently, an additional requirement—that the legislature did not expressly include in the language of the statute.[2] That insertion runs counter to the statutory command of ORS 174.010 "not to insert what has been omitted, or to omit what

---

[1] To the extent that the majority's reasoning could also apply to the ORS 656.005(19) terms "reproducible, measurable or observable," I would make the same responding arguments. I limit my discussion here to the term "verifiable" for purposes of clarity.

[2] Presented another way, the majority's conclusion essentially changes the language of ORS 656.005(19) to read: " 'Objective findings' in support of medical evidence are *verified* indications of injury or disease * * *."

has been inserted." Contrary to the majority's conclusion, the language of ORS 656.005(19) contains no requirement that the doctor making the diagnosis actually observe or verify the indications of injury during the examination.

The majority's reasoning builds upon clues and implications to reach the conclusion that the legislature intended to require that the indications of an injury or disease be *presently* verifiable at the time of the examination. Unfortunately, the express language of the statute provides otherwise.[3] The plain language of ORS 656.005(19) does not contain a *presently* verifiable requirement. If the legislature in fact intended that indications of injury be *presently* verifiable, then the legislature used the wrong words to convey that intent. *Deluxe Cabinet Works v. Messmer*, 140 Or App

---

[3] I must also disagree with the majority's comment that the legislative history supports the conclusion that it reaches. My review of the legislative history found that it was not conclusive on the issue before us. However, the following exchange between Representative Brown and Representative Mannix, one of the amendments' sponsors, is enlightening:

BROWN: "On page three, section 19, being non-medically trained, I would assume that there are conditions that are not, you can't find through x-ray or whatever. But, for example, a headache. Sometimes that is not always determinable. Say I have a headache and I am uncomfortable and I tell that to the doctor. Why isn't that sufficient evidence that I am in pain and that I have a headache?"

MANNIX: "Well, actually the question is whether or not we have objective findings. And the way the physician can evaluate your headache, by the way they can evaluate headaches through brain scans—it's serious in those situations—but they can evaluate through those kinds of technologies and see whether or not there is a pattern that is reproducible. They can also run a variety of tests on your head. *The most simple examination that a physician can carry out, and I am not pretending to be a physician, I'm just speaking off hand here, is, they can ask about the pain pattern. And if the pain pattern that you report, and then they can inquire at another time again, 'Where is the pain pattern?' And the pain pattern that you report is consistent with an accepted form of headache.* They can also do things as evaluate your physical movements, they can inquire, putting it all together. At some point a physician can verify, 'This appears to be a legitimate headache.' And usually that won't be a very serious issue. But if someone says they have chronic headaches, then they could start running MRI scans of the brain and everything else to try to document what the causation is." Tape recording, House Labor Committee, SB 369, March 1, 1995, Tape 38, Side B (emphasis added).

I understand Representative Mannix's comments to explain that subjective responses to diagnostic questioning that fit a medically recognized pain pattern are included within the definition of objective findings. Such responses formed the basis of Dr. Stringham's medical conclusions.

548, 555, 915 P2d 1053, *rev den* 324 Or 305 (1996) (if the legislature intends to change a statute, it must use language that, reasonably construed, actually changes the statute). We do not have the authority to rewrite a statute to give effect to what we speculate the legislature intended. *See Monaco v. U.S. Fidelity & Guar.*, 275 Or 183, 188, 550 P2d 422 (1976). ("This court cannot correct clear and unambiguous language for the legislature so as to better serve what the court feels was, or should have been, the legislature's intent."). However, that is what the majority opinion does.

I would affirm the Workers' Compensation Board's order that concludes that claimant's "toxic exposure condition" claim is compensable. The facts before us do not present a suspicious situation where a worker claims that he was injured in an unobserved "accident" at work—no one contests the fact that claimant here was exposed to toxic substances at his workplace. Nor is this an instance where a worker is complaining about lower back pain that has no apparent cause. Claimant was exposed to phenoxyherbicides and Stringham noted that claimant's description of his symptoms, as well as the sudden onset and gradual resolution of those symptoms, is consistent with a case of multiple toxic exposure to chemicals at a low dose. Stringham's conclusion that claimant's claim is compensable was based upon claimant's responses to diagnostic questioning, the fact that those responses fit a medically recognized pattern, and that that pattern was consistent with Stringham's own prior experiences treating workers exposed to multiple phenoxyherbicides. The Board was correct in relying upon Stringham's report in reaching its conclusion.

There is no evidence that claimant is attempting to "milk" the workers' compensation system. Claimant's claim is for a nondisabling injury. He merely seeks recovery of the medical costs he incurred to treat that injury. Claimant makes no claim for permanent or temporary disability. Claimant did not miss any work. In fact, claimant did as many of us would—continue to work expecting that the symptoms would go away. He sought medical attention only when some symptoms did not disappear within a reasonable

time period. Unfortunately for claimant, the majority concludes that he waited too long. If claimant had visited his doctor earlier, and the doctor had actually verified claimant's irritated eyes, sinus congestion and bright yellow phlegm and sputum, claimant's claim would have been compensable. But because claimant hesitated, the majority concludes that the workers' compensation system must declare his claim noncompensable.[4] That I cannot accept.

Accordingly, I respectfully dissent.

Deits, Chief Judge, and De Muniz and Armstrong, Judges, join in this dissent.

---

[1] Employer's "medical speculation of a work-related cause" argument is merely an attempt at an end-run around the substantial evidence standard. *See SAIF v. Valencia*, 148 Or App 263, 939 P2d 623 (1997) (discussing substantial evidence). Stringham concluded that the symptoms claimant suffered were the result of acute exposure to toxic chemicals at the workplace. The Board expressly found Stringham's reasoning and conclusions more persuasive than those of the other doctors who examined claimant. The Board's decision is supported by substantial evidence. *See Armstrong v. Asten-Hill Co.*, 90 Or App 200, 206, 752 P2d 312 (1988) (in workers' compensation cases, if there are doctors on both sides of a medical issue, whichever way the Board finds the facts will probably have substantial evidentiary support). I see no reason to disturb the Board's causation determination.